UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
REBECCA JANE BRUSH,                              :

         Plaintiff,                              :

         -v.-                              :        <u>OPINION AND ORDER</u>

                                       :        16 Civ. 8273 (GWG)

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,          :

         Defendant.                              :
----------------------------------------------------------------x
GABRIEL W. GORENSTEIN, United States Magistrate Judge

       Plaintiff Rebecca J. Brush brings this action pursuant to 42 U.S.C. § 405(g) for judicial

review of the final decision of the Commissioner of Social Security denying her claim for

disability benefits under the Social Security Act.  Both parties have moved for judgment on the

pleadings pursuant to Federal Rule of Civil Procedure 12(c).[1]  For the reasons stated below, the

Commissioner's motion is granted and Brush's motion is denied.

## I. BACKGROUND

    A.  <u>Procedural History</u>

       On March 12, 2012, Brush applied for disability and disability insurance benefits under

Sections 216(i) and 233(d) of the Social Security Act for allegedly disabling injuries to her back

and neck, as well as severe anxiety and depression.  <u>See</u> Certified Administrative Record, filed

Apr. 25, 2017 (Docket # 13) ("R."), at 17, 167, 331-34.  The Social Security Administration

---

[1]  Notice of Motion for Judgment on the Pleadings, filed July 17, 2017 (Docket # 17);
Plaintiff's Memorandum of Law in Support of Her Motion for Judgment on the Pleadings, filed
July 17, 2017 (Docket # 18) ("Pl. Mem."); Notice of Motion, filed Sept. 15, 2017 (Docket # 21);
Memorandum of Law in Support of Defendant's Motion for Judgment on the Pleadings and in
Opposition to the Plaintiff's Motion for Judgment on the Pleadings, filed Sept. 15, 2017 (Docket
# 22) ("Comm'r Mem.").

("SSA") denied Brush's application on July 12, 2012.  R. 167, 196-207.  She requested a review of the SSA's decision by an Administrative Law Judge ("ALJ"), R. 208-09, and hearings were held on June 14, and September 20, 2013, <u>see</u> R. 46-72, 73-104.  In a written decision dated November 25, 2013, the ALJ found that Brush was not disabled.  R. 168-89.

Brush appealed the decision to the Appeals Council, which remanded the case on May 13, 2015, for rehearing before the ALJ.  R. 190-93.  The Appeals Council instructed the ALJ to update the medical record, reassess Brush's maximum residual functional capacity during "the entire period at issue," and obtain additional evidence from a vocational expert.  <u>Id.</u>  On December 4, 2015, a supplemental hearing was held before the same ALJ.  R. 105-60.  In a written decision dated March 14, 2016, the ALJ again found Brush not disabled.  R. 14-36.  Brush requested review by the Appeals Council, which denied her request on August 25, 2016.  R. 1-4.  This action followed.

B.  <u>Hearings Before the ALJ</u>

Brush was represented by attorney John Lindholm at the June 14, and September 20, 2013 hearings before the ALJ, R. 48, 75, and by attorney Scott Goldstein at the December 4, 2015 hearing, R. 107.

Brush injured her neck and back while she was working as a custodian for a school district where she had held various jobs for about twelve years.  <u>See</u> R. 52-53, 117-19.  On the date of the incident, June 21, 2011, a dolly she was using slipped and she awkwardly moved her body while trying to catch it.  R. 432.  She was 38 at the time of the accident.  <u>See</u> R. 50, 182.  Brush said that after the accident she had chronic neck and lower back pain with weakness in both arms and frequent numbness in her fingers causing her to "drop mugs constantly."  R. 133, 135.  The numbness in her fingers was "really frustrating," because it limited her ability to enjoy

her hobbies, R. 61-62, while the weakness in her arms made lifting objects "difficult" and she could not lift more than "a gallon of water." R. 138. In addition to upper body issues, she also lost sensation in her right leg and could not sit for more than a half-hour at a time or walk for more than 15 to 20 minutes without rest. R. 136-37. As a result, she started to use a cane while walking outside. R. 64, 137. Additionally, because of the numbness in her right leg and unpredictable back spasms, she also worried about falling. R. 67. In fact, she claimed to have "fallen in [her] home four times because of [the spasms]" and, out of an abundance of caution, installed a shower bar. R. 55-56, 67.

The accident also aggravated her anxiety and depression, making it "100 times worse," R. 121, and she began to experience panic attacks "probably about once a week," R. 139. She relied on her partner to avoid more frequent panic attacks and generally avoided "go[ing] into stores by [her]self." R. 139-40. Her pain also reduced her ability to concentrate, making her "thoughts just wander" when she tried to read. R. 140.

With regard to her daily activities, Brush testified that she started her days by lying for "about an hour" on a heating pad, and then would repeat this practice in the afternoon and evening. R. 66. It usually would "take[] [her] several hours to get ready." R. 137. Most days, she would stay at home with her partner, who was also disabled, and watch movies and television, "sitting for probably 15 to 20 minutes" at a time and frequently changing positions. R. 64, 67, 138. She would also go on walks "every now and then, outside." R. 64. When not otherwise occupied, she performed "light" household chores, such as cleaning the kitchen and laundry, and reported that she "just ha[s] to be careful how [she] do[es] things." R. 65-66. Being careful reportedly included employing a back brace when cleaning to minimize pain and lying on her heating pad after completing a chore to treat the resulting pain. Id.

She would also leave the house "several times a week" to attend doctors' appointments, physical therapy, and to make "small trips to the grocery store" and the post office. R. 137; see also R. 56. She testified that she drove, but frequently pulled to the side of the road because she would "get dizzy and panicky." R. 54, 65. She was usually accompanied by her partner on these trips and testified that "if it was just myself, I would probably hardly ever leave the house." R. 65, 67. At the time of her first hearing in 2013, she was not a member of any social organizations, houses of worship, or any other similar organization. R. 67. She also reported losing her friends and hobbies as a result of the injury and, as an example, noted that she would miss her sister's wedding the following day because she was "not even up to attending [it]." R. 81, 140. While she vacationed with her parents every summer on Cape Cod, "it was pretty difficult because of my sleeping patterns, just everything." R. 81.

Following her injury, Brush reported that she was initially prescribed Tramodol and Motrin, but was later transitioned to Oxycodone (which reportedly "help[ed] with the pain . . . [but was] exhausting") and Advil. R. 55, 129-30. She also continued to take anti-anxiety medications, which her psychiatrist increased in the period following her injury, and was prescribed an antidepressant. R. 79-80, 119-21. In 2012, she underwent an anterior cervical discectomy and fusion, but felt "that [she] got worse. Because the pain in [her] back [] increased." R. 55. She also reported falling twice after the surgery, as a result of back spasms. R. 56. She subsequently explained, however, that in the six months after the surgery, the numbness in her fingers had, for the most part, "gotten better." R. 61.

At the third hearing, the ALJ called a vocational expert ("VE") as a witness. R. 147. Brush had testified that her past work as a custodian involved "mop[ping] the halls [and] large bathrooms[,] . . . clean[ing] after functions," R. 52, and "empty[ing] wastepaper baskets," R.

4

149.  Based on this testimony, the VE classified Brush's past work as a custodian as "heavy work" and "unskilled."  Id.

The ALJ then asked the VE to consider a person of the plaintiff's age, education, and work history, who could perform sedentary work, but who could only occasionally push, pull and crouch; must employ a cane to ambulate; could frequently flex, extend, and rotate the neck, and handle and finger objects; could understand, remember, and execute simple work and adapt to routine work place changes; and could occasionally interact with supervisors, coworkers and the general public.  R. 150.  The VE testified that such a person could perform the jobs of document preparer, stem mounter, addresser, and final assembler, all of which existed in significant numbers in the economy.  R. 150-51.  Upon clarification by the ALJ that the hypothetical individual could frequently move her neck, including but not requiring holding the neck in a "flexed position" for most of the work day, the VE confirmed that such a person could still perform those jobs.  R. 153-54.  The VE acknowledged that while the Dictionary of Occupational Titles does not address neck movement, based on the VE's own experience he believed that an individual "limited to being only able to flex, rotate, or extend the neck on only an occasional basis" could still perform such jobs.  R. 155.  But if the hypothetical person "can't keep their head in a flexed position downward" on at least an occasional basis, it would "make it difficult" to perform such jobs.  R. 156.  Last, in response to questioning by Brush's attorney, the VE testified that if the hypothetical person could sit, stand, and walk for only two hours each out of an eight-hour day, could do each for only 15 minutes at a time, and could lift only up to ten

pounds occasionally, then there would be no jobs available at a significant level in the economy. R. 157.

C.  Medical Evidence

Both Brush and the Commissioner have provided summaries of the medical evidence contained in the administrative record. See Pl. Mem. at 5-7; Comm'r Mem. at 4-21. The summaries are substantially consistent with each other. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Apr. 27, 2017 (Docket # 14), ¶ 5, and neither party has done so. Accordingly, the Court adopts Brush's and the Commissioner's summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in section III below.

D.  The ALJ's Decision

The ALJ denied Brush's application for disability benefits on March 14, 2016. R. 14. Following the five-step test set forth in SSA regulations, the ALJ found at step one that Brush had not engaged in "substantial gainful activity" since her alleged disabling injury on June 21, 2011. R. 19. At step two, the ALJ found that Brush had the following "severe impairments": adjustment disorder, depression, anxiety, panic attacks, status post anterior cervical discectomy and fusion operation, chronic pain syndrome, lumbago, and cervical, thoracic, and lumbar pain syndrome. Id.

At step three, the ALJ concluded that none of Brush's severe impairments singly or in combination met or medically equaled an impairment listed in 20 C.F.R. part 404, subpart p, appendix 1. R. 20. The ALJ gave "special consideration . . . to Listing 1.04 Disorders of the spine," see 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04 ("Listing § 1.04"), but concluded that Brush

6

did not meet or equal the listing because there was "no evidence in the record of motor loss accompanied by sensory or reflex loss," "spinal arachnoiditis," or "spinal stenosis with pseudoclaudication," and Brush "retain[ed] the ability to ambulate effectively." R. 20.

The ALJ also considered whether Brush's mental impairments "considered singly and in combination" met Listings 12.04, Affective disorders, or 12.06 Anxiety-related disorders, see 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04, 12.06 ("Listing § 12.04" and "Listing § 12.06"). R. 20.[2]  The ALJ found that Brush did not meet any of the "paragraph B" criteria for Listing §§ 12.04 and 12.06.  R. 20-21.  In her activities of daily living, the ALJ noted that Brush's pain and resultant loss of concentration "do not prevent her from living independently, driving,

---

[2]  To meet Listing §§ 12.04 or 12.06, an SSA applicant must meet the "paragraph B" or "paragraph C" criteria for each listing.  For paragraph B, an applicant must meet two of the following criteria:

> [m]arked restriction of activities of daily living; or [m]arked difficulties in maintaining social functioning; or [m]arked difficulties in maintaining concentration, persistence, or pace; or [r]epeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(B), 12.06(B).  Marked "means more than moderate but less than extreme," or "such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id. § 12.00(C).  Episodes of decompensation are "exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning," manifested by difficulties with the first three categories.  Id.

The SSA modified Listing §§ 12.04 and 12.06 in 2016, but the modifications did not go into effect until January 2017 and the implementing regulations state that the SSA will "apply them to new applications filed on or after the effective date of the rules, and to claims that are pending on or after the effective date." See Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66,138, 66,138 (Sept. 26, 2016) (to be codified at 20 C.F.R. pt. 404). The notice states that the SSA "expect[s] that Federal courts will review our final decisions using the rules that were in effect at the time we issued the decisions." Id. at 66,138 n.1.  Because Brush applied in 2012 and had her claim decided in 2016, R. 1-4, 167, the modifications do not apply to her case notwithstanding plaintiff's reliance on the modified version in her brief, see Pl. Mem. at 15.

shopping, cooking, cleaning, attending parties, going on family vacations, and applying for 'hundreds' of jobs as required by the State of New York," and the ALJ therefore found that she has only a mild restriction in activities of daily living.  R. 20.  While recognizing that her anxiety and depression caused interference with her relationships, the ALJ found that Brush was still able to "participate in celebrations, function[] appropriately in the clinical setting, ha[ve] a long-term relationship with her domestic partner, and attend[] family gatherings."  Id.  Thus, the ALJ concluded that Brush experienced only "moderate difficulties" in social functioning.  Id.  As for her claim that she had difficulties with concentration, persistence, or pace, the ALJ credited Brush's claim that her chronic pain interferes with her concentration, but concluded these difficulties were less than marked because she "report[ed] watching television, reading, and applying for multiple jobs," engaging in hobbies, and managing her own funds and condo.  R. 20-21.  Finally, the ALJ found no evidence of decompensation of an extended duration.  R. 21.  Because Brush exhibited no "marked" limitations or any episodes of decompensation, she did not satisfy the paragraph B criteria.  R. 20-21.[3]

_____

[3]  The ALJ also found that Brush failed to satisfy the "paragraph C" criteria for Listing §§ 12.04 and 12.06.  See R. 21.  The paragraph C criteria require the following:

[for § 12.04: A] [m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: 1. [r]epeated episodes of decompensation, each of extended duration; or 2. [a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or 3. a [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.  [And for 12.06:] [Anxiety r]esulting in complete inability to function independently outside the area of one's home.

Having found that Brush could not meet Listing §§ 1.04, 12.04, or 12.06, the ALJ next assessed Brush's residual functional capacity ("RFC"). R. 21. The ALJ found that Brush could

> perform sedentary work as defined in 20 CFR 404.1567(a) except can only occasionally push and pull; must ambulate with an assistive device; can handle and finger frequently bilaterally; can frequently flex, extend, and rotate the neck; can constantly hold the neck in one position including the flexion position; can occasionally crouch and stoop; can understand, remember, and carry out simple work; adapt to routine workplace changes; occasionally interact with supervisor, co-workers, and the public; and cannot work at unprotected heights.

Id. As for her physical impairments, the ALJ credited Brush's claim of back and neck impairments caused by her June 2011 fall, but found that the available neurological findings and other objective medical tests did not support her subjective claims as to the degree of resulting impairment or the persistence of the pain. R. 22-25. For instance, the ALJ noted that despite her claims of numbness, neurological diagnostic tests were repeatedly negative and she exhibited no signs of sensory or reflex deficits. Id. Additionally, while MRIs had at one time revealed disc herniation and levoscoliosis, she had since undergone various forms of treatment which she reported were effective and, according to her doctor, she "retained [a] normal range of motion in her upper and lower extremities, normal strength, and normal sensation." R. 23. The ALJ noted that in December 2011, she reported pain medication brought her "80% relief," and that in August 2014, she claimed massage therapy resulted in "an almost complete relief of her pain." R. 23, 25. In fact, one doctor around this time viewed Brush's pain as attributable to "muscular issues and not neurological ones." R. 23. The ALJ noted that, after Brush underwent an anterior cervical discesctomy and fusion in 2012, her reported pain and range of motion did not change apart from temporary reported improvements, that imaging was negative for abnormalities, and

---

20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.04(C), 12.06(C).

that she "retained [an] essentially normal range of motion, strength, and sensation in all other body parts," except her neck and low back. R. 24. In accordance with these findings, the ALJ found that Brush could perform "sedentary work with restrictions regarding neck use, crouching or stooping, lifting, pushing, and pulling." R. 24.

In reaching this RFC conclusion as to Brush's physical abilities, the ALJ evaluated the opinions of the various treating physicians and considered opinion evidence as to Brush's functional capacities. R. 25, 27-32. He specifically relied on the August 2013 medical opinion of Dr. Jean Bachar, finding that the neurological results supported "the above noted residual functional capacity." R. 24. The ALJ also accorded great weight to the opinions of Dr. Marc Berezin, an impartial medical examiner, and Dr. Steven Weinstein, an independent medical examiner, who both examined Brush on multiple occasions, reviewed her medical history, issued opinions "consistent with the record as a whole" and possessed "a longitudinal understanding of her condition." R. 27-28. Both doctors were also specialists in relevant fields: Dr. Berezin in orthopedics, and Dr. Weinstein in physical medicine, rehabilitation, and pain management. Id. The opinions of Dr. Enrique Sanz and Dr. Sunitha Polepalle were accorded "some weight," because they were "generally consistent" with the notes and opinions of contemporaneous examining physicians, but accorded less weight because they were given prior to Brush's surgery and the doctors did not review Brush's other medical records. R. 28.

The ALJ accorded little weight to the opinions of Dr. Ammaji Manyam, Mr. Kevin Stafford (a physical therapist), Dr. Jean Bachar, Dr. Robert DeSantis, and Dr. Marc Levinson because the opinions either predated Brush's surgery, were not based on or consistent with the medical records, or were not supported by "objective" medical evidence. R. 28-29.

As for her mental impairments, the ALJ found that the record "reflects the claimant has

10

limitations, but not to the degree alleged." R. 29. The ALJ relied extensively on the notes of Dr. Nelson Hidalgo, observing that the 'bulk of the[] records . . . discuss the claimant's relationship with her boyfriend, living independently in her condo, traveling to Cape Cod for a family vacation, relationships with her nephew, and the claimant's displeasure with having to look for other work." R. 25. The ALJ noted, however, that the notes did not reflect side effects of medication or functional deficits. Id. Neither did the record reflect functional loss associated with panic attacks R. 26. Rather, the ALJ weighed heavily Brush's own testimony that "she can feel a panic attack coming on and uses medicine and coping techniques to prevent the panic attack from manifesting in any significant way." Id. The ALJ also credited the opinions of several doctors that Brush had mild limitations with concentration. R. 30-31. As a result, the ALJ found that the record did not reflect a deterioration in Brush's functioning commensurate with her alleged functional loss related to her mental impairments. R. 26, 31.

In reaching his conclusion on Brush's mental RFC, the ALJ accorded great weight to Dr. Leslie Helprin, a consultative examiner; Dr. J. Dambrocia, a New York state agency medical examiner; and Dr. Robert Conciatori, an independent medical examiner, because all their opinions were "consistent with the medical record as a whole" and they were "familiar with the disability program." R. 30-31. Dr. Conciatori also had a "longitudinal understanding" of Brush's condition. R. 31. In contrast, Dr. Robert Hidalgo, Dr. Paul Schefflein, Dr. Martin Ogulnick, and Dr. Jeffrey Newton's opinions received little weight because the ALJ found their conclusions were inconsistent with their notes and the record as a whole or not based on mental status exams. Id. Finally, the ALJ accorded little weight to Global Assessment Functioning

scores[4] provided by many of the above mental health practitioners because they represented Brush's functioning only "at the time of the exam." R. 30.

Having weighed the credibility of various doctors' opinions, the ALJ then evaluated Brush's credibility. R. 32-33. The ALJ concluded that Brush's claims as to her impairments were "not wholly credible." R. 32. First, the ALJ questioned the candidness of her account of her abilities. He noted that despite allegations that she was completely disabled, Brush could reportedly attend birthday parties, a July 4th gathering, a Memorial Day celebration, and family vacations on Cape Cod, in addition to living and driving independently, and enjoying various hobbies requiring concentration and fine finger movement. Id. With this view of the evidence, the ALJ characterized Brush's testimony as "fraught with inconsistencies" and "lack[ing] veracity to support her complaints." Id. Second, Brush received various treatments following her injury and regularly reported to her physicians that the treatments were improving her condition. Id. The ALJ viewed this testimony as contradicting her claim of disability. R. 32-33. Third, the ALJ found that the medical source opinions that supported Brush's testimony were inconsistent with the evaluations of the independent medical examiners and seem to recite only Brush's self-reported symptoms. R. 33. Fourth, the ALJ found that she was able to work previously with many of the same mental impairments, and that the treatment notes do not reflect a deterioration in those impairment areas. Id. Last, he observed that her subjective complaints of pain and functional limitations were repeatedly rebutted by doctors who found no objective abnormalities in her back or neck, and at least one who thought Brush exhibited

_____

[4] A Global Assessment Functioning score is a rating of a patient's overall social, psychological, and occupational functioning. See Mulero v. Colvin, 2014 WL 4081011, at *2 n.1 (S.D.N.Y. Aug. 18, 2014).

"symptom amplification." Id. Based on these findings, the ALJ found Brush's subjective complaints of disability "not wholly credible." R. 32.

At step four, the ALJ found that Brush could no longer work as a custodian or custodial clerk. Id. Instead, she required "an eroded form of sedentary work." Id. At step five, the ALJ assessed whether "there are jobs that exist in significant numbers in the national economy" considering Brush's RFC, age, educational attainment, work experience, and the Medical-Vocational Guidelines, 20 C.F.R. part 404, subpart P, appendix 2. R. 34. Because Brush's RFC was less than the performance requirements for sedentary work under the Medical-Vocational Rules, the ALJ relied on the VE's opinion. Id. The ALJ accepted the VE's testimony that a person with Brush's exertional and non-exertional limitations could perform the jobs of document preparer, stem mounter, addresser, and final assembler, all of which existed in significant numbers in the national economy. R. 34-35. The ALJ concluded that Brush was not disabled within the meaning of the Act. R. 35.

## II. GOVERNING STANDARDS OF LAW

### A. Scope of Judicial Review Under 42 U.S.C. § 405(g)

It is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012). Rather, a court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted).

B.  <u>Standard Governing Evaluation of Disability Claims by the Agency</u>

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his or her "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  <u>Id.</u> § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); <u>accord</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); <u>Craig v. Comm'r of Soc. Sec.</u>, 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim.  <u>See</u> 20 C.F.R. § 404.1520(a)(4); <u>see also</u> <u>Burgess</u>, 537 F.3d at 120 (describing the five-step process).  First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," <u>id.</u> § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic

work activities," id. § 404.1520(c).  Third, if the claimant's impairment is severe and is listed in 20 C.F.R. part 404, subpart P, appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his or her age, education, or work experience.  See id. § 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work."  Id. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or she is not disabled.  Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC permits the claimant to do other work.  Id. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform.  See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

      C.  The "Treating Source" Rule

      In general, the ALJ must give "more weight to medical opinions" from a claimant's treating sources when determining if the claimant is disabled.  See 20 C.F.R. § 404.1527(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").  Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 404.1527(c)(2).  An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the

claimant's] case record." Id. Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.") (citations omitted).

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider factors set forth in the Commissioner's regulations, which include (i) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. § 404.1527(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. § 404.1527(c)(2)-(6)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77.

D.  Credibility Determinations

"It is the function of the [Commissioner], not [the reviewing court], to resolve

evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."

Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales,

402 U.S. at 399) (additional citations omitted).  Thus, the ALJ, "after weighing objective

medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to

discredit the claimant's subjective estimation of the degree of impairment."  Tejada v. Apfel, 167

F.3d 770, 775-76 (2d Cir. 1999) (summarizing the holding of and citing with approval

Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)).  Nonetheless, when

discounting a claimant's credibility regarding his or her residual functional capacity, regulations

impose some burden on the ALJ to explain his or her decision.  As the Second Circuit has stated:

> When determining a claimant's RFC, the ALJ is required to take the claimant's
> reports of pain and other limitations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir.
> 1980), but is not required to accept the claimant's subjective complaints without
> question; he may exercise discretion in weighing the credibility of the claimant's
> testimony in light of the other evidence in the record.  Marcus v. Califano, 615
> F.2d 23, 27 (2d Cir. 1979).

Genier, 606 F.3d at 49; see also 20 C.F.R. § 404.1529.  To evaluate a claimant's assertion of a

limitation, the ALJ must engage in a two-step process:

> At the first step, the ALJ must decide whether the claimant suffers from a
> medically determinable impairment that could reasonably be expected to produce
> the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from
> the fact that subjective assertions of pain alone cannot ground a finding of
> disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an
> impairment, at the second step, the ALJ must consider "the extent to which [the
> claimant's] symptoms can reasonably be accepted as consistent with the objective
> medical evidence and other evidence" of record.  Id.  The ALJ must consider
> "[s]tatements [the claimant] or others make about [her] impairment(s), [her]
> restrictions, [her] daily activities, [her] efforts to work, or any other relevant
> statements [she] make[s] to medical sources during the course of examination or

treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings." 20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier, 606 F.3d at 49 (alterations and emphasis in original).

The SSA has issued regulations relating to reports of pain or other symptoms affecting the ability to work by a claimant for disability benefits. 20 C.F.R. § 404.1529(c). These regulations provide, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." Id. § 404.1529(c)(2). The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence." Id. § 404.1529(c)(4).

Where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll, 705 F.2d at 643); accord Craig, 218 F. Supp. 3d at 263. The ALJ must make this determination "in light of medical findings and other evidence[ ] regarding the true extent of the pain alleged by the claimant." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (internal quotation marks omitted) (quoting McLaughlin, 612 F.2d at 705). However, where an ALJ gives specific reasons for finding the claimant not credible, the ALJ's credibility determination "is generally entitled to deference on appeal." Selian, 708 F.3d at 420 (citing Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009) (summary order)). Thus, "[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to

discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

III. DISCUSSION

Brush makes a number of arguments attacking the ALJ's decision. She contends (1) that the ALJ improperly found she did not meet Listing § 12.04, Pl. Mem. at 15; (2) that the ALJ did not properly apply the "treating physician rule," id. at 12-15, 20; (3) that the ALJ's RFC determination was not supported by substantial evidence, id. at 20; and (4) that the ALJ did not properly assess her credibility, id. at 20-21. Because the ALJ's application of the treating source rule affects his Listing § 12.04 and RFC determinations, we begin there.

A. Treating Source Rule

1. Physical Impairments

Brush asserts that the ALJ mischaracterized the physical exam findings of Dr. Levinson, see Pl. Mem. at 13-14, and misused her testimony to discredit Dr. DeSantis's opinions, id. at 14-15, and that therefore the ALJ improperly gave their opinions little weight, id. at 13-15. In a similar vein, Brush objects to the weight the ALJ gave to the opinions given by independent examining physicians Drs. Berezin and Weinstein. Id. at 12-13.

Dr. Levinson treated Brush from 2011 to 2013. See, e.g., R. 436, 456, 762. The ALJ stated that in May 2013, Dr. Levinson opined that "Ms. Brush still cannot lift, push and pull as much as usual." R. 29 (citing "Ex. 30F at 3"), 765. The ALJ afforded this opinion "very little weight," because it was not "supported by the medical evidence," was "vague . . . as Dr. Levinson does not tell us the maximum amount of weight the claimant can maneuver," and the

opinion stood in contrast to "largely normal" physical exam findings.  R. 29.  Brush takes issue

with the last reason, contending that the ALJ was "just wrong" in his characterization of the

evidence as "largely normal."  Pl. Mem. at 13.  Rather, Brush argues, Dr. Levinson made

abnormal findings at an October 2011 exam and a June 16, 2013 exam.  Id.

        To begin with, Dr. Levinson did not in fact provide the opinion at issue.  Rather, a

physical therapist at Pro Motion Physical Therapy, Paul Eghazaly, provided this opinion.  See R.

766.  Because a physical therapist is not an acceptable medical source, this opinion is not due

controlling weight.  See, e.g., Molina v. Colvin, 2014 WL 2573638, at *9 (S.D.N.Y. May 14,

2014) ("A physical therapist is not an 'acceptable medical source' as defined in the

regulations.") (quoting Cascio v. Astrue, 2012 WL 123275, at *3 (E.D.N.Y. Jan. 17, 2012));

accord Littlefield v. Colvin, 2017 WL 4221142, at *24 n.27 (S.D.N.Y. Aug. 31, 2017).  In any

event, we find no error with the ALJ's decision to accord the opinion little weight because even

if we had agreed with Brush about Dr. Levinson's physical exam findings — which we do not —

we would still find the ALJ's other reasons for giving little weight to Eghazaly's opinion

supported by substantial evidence.

        First, the ALJ noted that Eghazaly's opinion was "a vague statement . . . provid[ing] little

insight as Dr. Levinson [sic] does not tell us the maximum amount of weight the claimant can

maneuver."  R. 29.  We agree that the statement is vague.  To determine whether an individual

can meet the exertional requirements of work in the national economy, the ALJ must determine

how many pounds a claimant can lift and how frequently she can lift that weight.  See 20 C.F.R.

§ 404.1567(a).  Here, Eghazaly's statement provided no such guidance.  For this reason alone,

the ALJ did not err in discounting it.

Second, the ALJ fairly concluded that the opinion "was not supported by the medical evidence" in the record, R. 29, because the opinion contradicts a March 2013 report of Dr. Jacobs, a treating source, who observed that Brush had 5/5 strength in her shoulders and wrists, normal reflexes, intact sensation, and that she walked with a normal gait and station. R. 716.

As a result, the ALJ had "good reasons," Halloran, 362 F.3d at 33, for giving very little weight to Eghazaly's opinion. See Veino, 312 F.3d at 588 (treating sources "need not be given controlling weight where they are contradicted by other substantial evidence in the record.").

Additionally, as the contemporaneous physical exam findings were indeed "largely normal," the ALJ did not mischaracterize them. R. 29. The most adverse finding in the June 2013 examination (actually conducted by Eghazaly) is that Brush had 12 degrees of extension in her lumbar region while a normal individual has a 25 degree extension. See R. 765-66. Otherwise, the examination reports cervical and lumbar testing close to a normal range (e.g., 40 degree right lateral flexion when normal is 45 degrees) and reports negative straight leg raise tests bilaterally. Id. Similarly, in the October 2011 exam that Brush cites extensively, see Pl. Mem. at 13, Dr. Levinson reports testing "within normal limits" for sensation, strength, and tenderness in the upper extremities; some decreased range of motion, tenderness, and bilateral spasm in the lumbar spine, but "normal" lumbar rhythm, bilateral sacroiliac mobility, and right rotation with flexion; and testing "within normal limits" of range of motion, muscle strength, and tenderness in the lower extremities. See R. 433-34. Brush does correctly note some abnormal findings in the cervical spine, see Pl. Mem. at 13, but these results are not overwhelmingly negative, see R. 433. Additionally, Brush quotes the doctor's observations of her limited ability to ambulate during both the June 2013 and October 2011 exams, see Pl. Mem. at 13, but such observations were not the objective "physical exam findings" that the ALJ was referring to, see

R. 29, which were rather those identified by Dr. Levinson in the June 2011 exam underneath the heading "Physical Examination," R. 433. Accordingly, we find that the ALJ did not err in his decision to accord little weight to Eghazaly's opinion.[5]

Brush also objects to the "very little weight" given Dr. DeSantis's opinion that she could not perform sedentary work, contending that the ALJ misconstrued Brush's hearing testimony about her lifting capacity in rejecting Dr. DeSantis's opinion. Pl. Mem. at 14-15. As the ALJ noted, however, Dr. DeSantis is a chiropractor, and because a chiropractor is not an "acceptable medical source," an ALJ is not required to give a chiropractor's opinions controlling weight under the Commissioner's regulations for treating sources. See Diaz v. Shalala, 59 F.3d 307, 313-14 (2d Cir. 1995) (chiropractor does not qualify as an acceptable medical source and therefore under no circumstances can the regulations be read to require an ALJ to give controlling weight to a chiropractor's opinion); see also SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006) ("other sources," like a chiropractor, "cannot establish the existence of a

---

[5] Brush also challenges the accuracy of the ALJ's statement that Dr. Levinson's "various opinions . . . all provide a percentage of impairment and are not function by function assessment[s]," R. 29. See Pl. Mem. at 14. Brush does not cite to any statements in the record to support this argument, however. Her only counterexample is a diagnosis given on June 11, 2013 by Dr. Levinson. Id. (citing R. 822). This diagnosis, however, does not speak to Brush's functional abilities and is therefore useless for evaluating the RFC. See R. 822. We also note that Dr. Levinson's disability percentages were provided for the purpose of bolstering Brush's State of New York workers' compensation claim. R. 26. Such opinions, however, are not entitled to any weight, because they do not address the Commissioner's role in determining the ultimate question of disability and because they are not function-by-function assessments. See 20 C.F.R. § 404.1504; see also Coria v. Heckler, 750 F.2d 245, 247 (3d Cir. 1984) (noting that Social Security disability determinations "are not geared to a percentage of disability, as are worker's compensation disability conclusions" and thus "the ALJ could reasonably disregard so much of the physicians' reports as set forth their conclusions as to [the claimant's] disability for worker's compensation purposes."); accord Ackley v. Colvin, 2015 WL 1915133, at *5 (W.D.N.Y. Apr. 27, 2015). Thus, the ALJ did not commit error in giving the opinions very little weight. R. 29.

medically determinable impairment . . . [but] may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."); accord Monette v. Astrue, 269 F. App'x 109, 113 (2d Cir. 2008) (summary order); Shamburger v. Colvin, 2017 WL 4003032, at *3 (W.D.N.Y. Sept. 12, 2017) (citing cases). Thus, the ALJ did not need to consider the treating source rule in giving his opinions "very little weight." R. 29.

In any event, Brush's testimony was only one of several reasons why the ALJ gave Dr. DeSantis's opinion little weight. The ALJ also reasoned that Dr. DeSantis's opinion was "not well supported by the claimant's admitted activities of daily living, the exams from multiple independent medical examiners [i.e., Drs. Weinstein and Berezin], [and] the objective findings in the record." R. 29. We find that these reasons support the ALJ's decision. For instance, the ALJ correctly observed that Dr. Weinstein, a specialist in physical medicine, rehabilitation, and pain, contradicted Dr. DeSantis's accounts of Brush's capacity, because Dr. Weinstein found only "limited objective abnormality that [would] prevent[] this claimant from working in some capacity" and that Brush could "exert up to 20 pounds of force occasionally and up to 10 pounds of force frequently." R. 969. Likewise, Dr. Berezin, another orthopedic specialist, concluded in December 2015 that Brush had only a "moderate (50%) degree of disability." R. 1028. Additionally, the claimant testified to her ability to clean, cook, sit, stand, walk outside, and leave the house for shopping. See R. 54, 65-66, 137, 143, 612-13, 967. Last, objective testing from Dr. Jacobs in 2012 and 2013 showed that Brush's surgery had been successful, that she reported consistent improvement and reduced pain and numbness, and that she showed five out of five upper extremity strength and two plus reflexes. See R. 715-16, 722-24, 725-26. From Brush's testimony, Dr. Jacob's examinations, and the contrary opinions of Drs. Weinstein and

Berezin, it was reasonable of the ALJ to conclude that Dr. DeSantis had not accurately assessed Brush's functional limitations.

In contrast to the weight given to the opinions of Drs. DeSantis and Levinson, the ALJ gave great weight to the opinions of Drs. Berezin and Weinstein.  R. 27.  We find no error in that choice.[6]  The ALJ granted these opinions deference because each doctor had a longitudinal view of the case, the opinions changed with Brush's various treatments, the doctors' opinions were consistent with the record as a whole, the doctors cited to objective medical evidence to support their conclusions, and both doctors were specialists in relevant areas.  R. 27.  In so reasoning, the ALJ referenced each of the § 404.1527 factors.  See also Greek, 802 F.3d at 375-77.  Having examined these doctors' reports, see R. 962-69 (Dr. Weinstein's second evaluation), 1025-29 (Dr. Berezin's fourth evaluation), we find the ALJ's reasons supported by substantial evidence. Both doctors had access to Brush's medical records at the time of their examinations and provided summaries of her medical history.  See, e.g., R. 496-97, 881-84.  Each saw Brush more than once: Dr. Berezin, for instance, examined Brush in 2011, 2012, 2013, and 2015, see R. 496, 500, 834-35, 1025-29; while Dr. Weinstein examined Brush in both 2014 and 2015, see R. 881-87, 962-69.  And both grounded their opinions in objective medical evidence and the record. See, e.g., R. 835 (Dr. Berezin in 2013 noting that "[t]here is discrepancy [between] her current complaints [to him with the] office note of Dr. Jacobs of 03/25/13 where she states she has been progressively improving since the surgery"), 882 (Dr. Weinstein also noting the discrepancy between her current complaints and Dr. Jacobs' office notes from March 25, 2013), 969 (Dr.

---

[6]  Brush asserts, without evidentiary support, that these two doctors are biased in favor of the insurance industry.  See Pl. Mem. at 12-13.  Brush, however, cites no evidence or case law for her claim and thus we do not address it further.

Weinstein noting that "[a]side from the claimant's history of ACDF at C5-6, there is limited objective abnormality that prevents this claimant from working in some capacity," and then citing the objective evidence). We also note that an ALJ may give more weight to non-treating doctors' opinions as long as he or she provides good reasons for doing so. See Halloran, 362 F.3d at 32-33 (upholding ALJ decision to accept examining source's findings as more consistent with the record where the ALJ provided "good reasons"); see also Valentin v. Berryhill, 2017 WL 3917004, at *13 (S.D.N.Y. Sept. 6, 2017) ("[consulting sources] may be favored where a treating source's opinion does not have adequate support"); Mayor v. Colvin, 2015 WL 9166119, at *18 (S.D.N.Y. Dec. 17, 2015) (ALJ properly apportioned more weight to consultative psychiatric examiner than to treating source since it was more consistent with record). Having provided such reasons, the ALJ committed no error in according greater weight to the opinions of Drs. Berezin and Weinstein than to Drs. Levinson and DeSantis.

### 2. Mental Impairments

Brush contends that the ALJ did not properly weigh the testimony of her treating psychologists, Drs. Hidalgo, Ogulnick, and Newton. Pl. Mem. at 16, 18-20.

The ALJ apportioned little weight to the opinions of Dr. Newton because he offered opinions inconsistent with his notes. R. 31-32. Specifically, the ALJ concluded that Dr. Newton's opinion that Brush had moderate to extreme limitations in most mental abilities was not supported by "the record as a whole," and remarked that Dr. Newton "supported his conclusions with inconsistent narratives." R. 31. We agree. Dr. Newton concluded that Brush could not work and that she exhibited marked to extreme limitations in her mental abilities, R. 1000-02, but his contemporaneous notes mostly reflect concerns over fraud allegations, her changing doctors, her financial resources, and her chronic pain, R. 974-75, 979, 983-85, 1016.

Were Brush exhibiting severe mental impairments, one would expect a treating psychiatrist to note them and potentially to adjust medication based on such findings. See generally Valentin, 2017 WL 397004, at *15 (ALJ properly attributed little weight to psychiatric opinions that ignored positive signs in providing a functional limitations opinion and contradicted the record as a whole). Here, however, we find no indication in Dr. Newton's notes that Brush was exhibiting extreme limitations in her mental functioning. Additionally, Brush's own testimony did not corroborate Dr. Newton's opinion that Brush "barely takes care of her needs." R. 1021. Rather, Brush testified to regularly driving, grocery shopping, applying for jobs, cleaning her apartment, reading and watching TV, attending biweekly therapy sessions and other doctors' appointments, and to maintaining an eight-year relationship, see R. 54, 65-66, 110-11, 137, 143, 612-13, 967. Finally, the ALJ accorded little weight to Dr. Newton's opinions because they contradicted the findings of Drs. Helprin, Dambrocia, and Conciatori, whose opinions are examined below. Given these inconsistencies, the ALJ was not required to give Dr. Newton's opinions controlling weight. See Halloran, 362 F.3d at 32 (treating physician's opinion not controlling where opinion internally inconsistent or inconsistent with the record as a whole).

The ALJ was also justified in discrediting Dr. Hidalgo's opinions. Although Dr. Hidalgo asserted that Brush's mental abilities were deteriorating, R. 775, his notes did not reflect any deterioration in functional abilities, see R. 597-603, 666-67, 679-83, 711, 713, 716, 775, 801, 816-20. Dr. Hidalgo's May 2012 report consisted of mostly normal findings with regard to concentration, memory, understanding, persistence, and social interaction and adaptation. R. 597-603, 793-99. By November 2012, Dr. Hidalgo reports moderate restrictions of daily living, marked difficulties in maintaining social functioning, and constant deficiencies of concentration and deterioration, R. 667-71, but his notes do not support these opinions.

Moreover, Dr. Hidalgo's opinions were contradicted by the opinions of Dr. Helprin, who found in May 2012 that Brush was cooperative, had an adequate manner of relating to others, exhibited normal social skills, talked coherently, could concentrate within a normal range, and had an unremarkable overall presentation. R. 611-14. Likewise, Dr. Dambrocia[7] observed in July 2012 that Brush "retained adequate cognitive functioning," "[was] able to understand and remember instructions, and sustain attention and concentration for tasks," though "[she] may have difficulties relating with others and/or adapting to changes." R. 654. Additionally, Dr. Conciatori found in November 2012 that Brush was "alert and oriented," "cooperative," "coherent and goal-directed," and that her short term memory and concentration were intact. R. 754. Nonetheless, in June 2013, Dr. Hidalgo reaffirmed his November 2012 conclusion in a letter provided to Brush, opining in a vague fashion that "it is highly improbable that at this time she can hold or sustain any work needing a healthy emotional make-up." R. 775. On this record, the ALJ had sufficient evidence to discount Dr. Hidalgo's opinions. In doing so, the ALJ also considered all the § 404.1527 factors, including the length and nature of the treating relationship, the support of the opinion with relevant evidence, the opinion's consistency with the record, and the doctor's speciality. R. 31.

For the same reasons, the ALJ did not err in rejecting Dr. Ogulnick's opinion, expressed in a November 2015 "mental residual functional capacity assessment" questionnaire, R. 998-1005, that Brush had moderate to marked impairments in most functional areas. R. 26, 31. The

---

[7] Brush argues that Dr. Dambrocia's opinion should not have been afforded any weight because one report, R. 638, identifies him as a cardiologist. Pl. Mem. at 16. The Government directs our attention, however, to his licensing information which shows that he is a licensed psychologist. Verification Searches, Dambrocia, Joseph Paul, License No. 010566, http://www.op.nysed.gov/help.htm#status. The notation was therefore a mistake.

questionnaire diagnoses Brush with major depression, single episode, severe, and notes that she exhibits anhedonia or pervasive loss of interests, sleep disturbance or dysfunction, feelings of guilt or worthlessness, difficulty thinking or concentrating, poor memory, short attention span, suicidal ideation, anxiety (generalized, persistent), motor tension, apprehensive expectation, intrusive recollection of a traumatic experience, mood disturbance and emotional lability. R. 998-99. In the questionnaire, Dr. Ogulnick opines that Brush had marked limitations in "remember[ing] and understand[ing] detailed instructions," "carry[ing] out detailed instructions," "maintain[ing] attention and concentration for extended periods," "maintain[ing] regular attendance," "perform[ing] consistently without an unreasonable number and length of rest periods," "complet[ing] a normal workweek without interruption from psychologically based symptoms," and "accept[ing] instructions and respond[ing] appropriately to criticism from supervisors." R. 1000-02. Dr. Ogulnick's treatment notes, however, do not support such extreme limitations and noted symptoms. For instance, his notes from 2015 largely report Brush's concerns about her treatment by the workers' compensation system and the SSA, and stress over her finances, while observing that she exhibits no delusions, that her insight and judgment are fair to good, and that she is applying for jobs. See R. 946, 948, 950-51. The treatment notes also do not reference reductions in functioning capacity, apart from observations that Brush spoke in a choppy, hesitant, and distracted manner, that her thinking was scattered, that she was experiencing panic attacks, and that she claimed reductions in concentration when driving at night. R. 838-42, 939-41, 942-55, 998-1005. Moreover, the treatment notes were contradicted by the report from Dr. Conciatori provided in December 2015, see R. 1033-37, which found that Brush had "a mild degree of psychiatric treatment," after observing, inter alia, that Brush "correctly interpreted proverbs and was able to abstract without difficulty," R. 1035-

36. The ALJ specifically noted that he rejected Dr. Ogulnick's opinion that Brush has "the ability to take care of 'basic daily activities such as grooming, but is limited . . . [in] such activities as cleaning, shopping, etc.'" R. 31 (quoting Dr. Newton at R. 1004). Dr. Ogulnick's assertion sharply contrasts with Brush's repeated testimony to the contrary about her abilities to drive, clean, cook, and perform other routine daily activities beyond grooming. See R. 54, 65-66, 137, 143, 612-13, 967. For all these reasons, the ALJ could properly choose to give little weight to Dr. Ogulnick's functional assessments.

Finally, Brush challenges the weight given to Dr. Helprin's opinion about Brush's ability to deal with stress in the workplace. Pl. Mem. at 17. While the ALJ generally gave "great weight" to Dr. Helprin's opinion, the ALJ did not give significant weight to Dr. Helprin's opinion about Brush's capacities for stress. R. 30. Giving different weight to different parts of a medical opinion is generally acceptable. See Howe v. Colvin, 2013 WL 4534940, at *14 (S.D.N.Y. Aug. 27, 2013). Dr. Helprin had opined that Brush could follow and understand simple directions and instructions, perform simple rote tasks, maintain attention and concentration, maintain a regular schedule, make appropriate decisions, but had difficulties with relationships and dealing with stress "due to her anxiety in public places." R. 613. The ALJ found that last opinion "unsupported by the record," because the record suggested that with medication and therapy Brush could deal with stress from work. R. 30. The ALJ pointed to Brush's past work experience while also suffering from anxiety and panic attacks. Id. Indeed, Brush testified at the hearing that she started taking antianxiety medications at about age 20. See R. 120-21, 141. And while she also alleges that her anxiety worsened following her injury, R. 120-21, the ALJ also had available Dr. Conciatori's opinion in November 2012 that the work accident only accounted for 30% of her psychiatric symptoms at the time, R. 751. Given the

lack of evidence negating Brush's ability to handle stress in the workplace using medicine and psychotherapy treatment, the support for both sides from the record, and "the ALJ's duty, as the trier of fact, to resolve conflicts between conflicting medical opinions," see Hayes v. Berryhill, 2017 WL 4326118, at *7 (S.D.N.Y. Sept. 28, 2017) (citing Richardson, 402 U.S. at 399), we find that the ALJ could properly discount Dr. Helprin's opinion concerning Brush's capacity for workplace stress.

In sum, we find no error in the ALJ's application of the treating source rule to this case.

B. Claimant's Credibility

In addition to arguing misapplication of the treating source rule, Brush also contends that the ALJ erred in finding her subjective allegations of disability not wholly credible. See Pl. Mem. at 20-21. As previously noted, it is not the Court's role to decide the credibility of witnesses but rather the Commissioner's. See Tejada, 167 F.3d at 775-76. "[I]t is the function of the Commissioner, not ourselves, . . . to appraise the credibility of witnesses, including the claimant." Campbell v. Astrue, 465 F. App'x 4, 7 (2d Cir. 2012) (summary order) (alterations omitted) (internal quotation marks omitted) (quoting Carroll, 705 F.2d at 642).

In this case, substantial evidence supports the ALJ's credibility finding. Following the Commissioner's regulations, the ALJ first determined that Brush's reported symptoms were consistent with her medically determinable impairments, R. 22, but also concluded that Brush's testimony regarding the extent of her functional limitations was "poorly supported by the contemporaneous treatment notes of her medical providers" and therefore not credible, R. 32. The ALJ noted that Brush had reported limitations in her daily activities consistent with her symptoms, but also noted that she did "not appear to [] provide a candid account of abilities [that] she [did] retain." Id. Brush, noted the ALJ, also told several medical providers — in

contradiction to her testimony — that treatment was improving her condition and reported no side effects to her medications. Id. The ALJ further noted that Brush's testimony contradicted the results of objective medical testing concerning her neurological deficits and lingering problems in her back after surgery. R. 33. Last, the ALJ noted that her "treatment notes do not reflect a deterioration of her functioning as alleged" and that she was previously able to work in spite of the psychological impairments she now claims totally disable her. Id.

Brush argues that her testimony "has been consistent throughout" and "consistent with the medical evidence in the record," Pl. Mem. at 20, but she does not specify where the ALJ erred in his opposite finding and we find the record supports the ALJ's finding. For example, Brush provided conflicting testimony to Dr. Jacobs and Dr. Berezin concerning the effect of surgery on her back pain, see R. 835 (Dr. Berezin noting conflicting testimony); see also R. 715-16 (Dr. Jacobs' report noting that "patient states the neck pain has progressively improved since the surgery"), 722-24 (same), 727 (same), and she asserted that she feels numbness in her fingers and radiating pain from her neck, R. 61, all while having no observable neurological deficits and normal x-rays and MRIs, R. 958. Accordingly, we find no error in the ALJ's credibility determination.

C. Psychological Impairment Listings

Brush argues that the ALJ erred in determining that she did not meet the elements of Listing § 12.04, Affective Disorders. Pl. Mem. at 16-20. We disagree.

The ALJ had substantial evidence to support his conclusion that Brush met none of the paragraph B factors. R. 20. As for daily activities, the ALJ found only a mild restriction, observing that Brush lived independently, drove, shopped, cooked, cleaned, attended parties and family getaways, and applied for "hundreds" of jobs. Id. These findings are supported by

Brush's hearing testimony and the notes in the record. See R. 54 (driving), 65-66 (shopping and chores), 110-11 (job search), 137 (describing daily activities, such as visits to post office), 143 (going to Cape Cod each summer, considering trip to San Francisco), 612-13 (reported daily activities for 2012 psychiatric evaluation), 967 (daily activity report for 2015 IME). The ALJ found greater impairments in Brush's social functioning, but ultimately concluded that they were only moderate. R. 20. In support of this finding, the ALJ noted that Brush had maintained a long-term relationship with her domestic partner, and occasionally attended parties and family gatherings, though the ALJ accepted that her anxiety and depression had interfered with her relationships. Id. This finding is also supported by Brush's testimony. R. 82 (4th of July Party), 116 (long-term relationship with her partner), 146-47 (Cape Cod). Next, the ALJ found that Brush possessed moderate difficulties with concentration, persistence, and pace. R. 21. As the ALJ noted, Brush managed her own finances, applied for multiple jobs, completed craft hobbies, watched television, and read. R. 110-11, 606, 612-13. Additionally, Dr. Helprin had opined that Brush was able to maintain attention and concentration. R. 613. Finally, the ALJ found no episodes of decompensation. R. 21. This finding is supported by extensive treatment notes from her treating and examining psychiatrists that do not document a hospitalization or other acute exacerbation of her symptoms.

The ALJ also had substantial evidence to support his finding that Brush met none of the Paragraph C criteria. The ALJ found no evidence that Brush "cannot function outside a highly supportive living arrangement," R. 21, a finding supported by Brush's testimony that she has lived independently and managed her own affairs outside and inside the home throughout her application process, see, e.g., R. 967 (daily activity report for 2015 IME). The ALJ also found no repeated episodes of decompensation in the record or a "residual disease process" that leaves

33

Brush vulnerable to predictable decompensation, R. 21, and neither do we. The record does demonstrate that Brush experienced persistent panic attacks, anxiety, and depression, but she has never been hospitalized or otherwise experienced an acute deterioration in her functioning. See, e.g., R. 423-31 (notes from February 2011 hospitalization for panic attack, predating her allegedly disabling injury). She also reported an ability to preview her panic attacks and manage her depression and anxiety through medication and coping techniques. See R. 946-55.

    D. RFC Determination

    With regard to the ALJ's determination of Brush's physical RFC, Brush argues that the ALJ "should have found greater limitations on the plaintiff's ability to sit, use her hands for fingering and handling, and rotate/extend and flex the neck, . . . a greater need for unscheduled breaks . . . . [and] considered . . . claimant's likeliness to be absent from work at least three times per month." Pl. Mem. at 20. While some evidence in the record supports these limitations, we find ample evidence to the contrary that supports the ALJ's RFC determination.

    As for the RFC generally, two treating sources and three examining sources concluded that Brush was capable of performing a wide range of sedentary work with limited exertional capacities. Dr. Polepalle, a treating physician, concluded in April 2012 that Brush was restricted only in pushing, pulling, or lifting more than 15 pounds, R. 540 — a weight that is more than five pounds over the requirement for sedentary work, see 20 C.F.R. § 404.1567(a) (sedentary work requires "lifting no more than 10 pounds at a time"). Likewise, Dr. Jacobs, Brush's surgeon, noted his agreement with the functional limitations opinion of Physical Therapist Kevin Stafford who had opined, seven months after Brush's surgery, that Brush was capable of sedentary work, so long as she could alternate positions as needed, walk at her own pace, and was not expected to constantly manipulate small objects with her fingers. See R. 692-93 (letter

from Stafford to Dr. Jacobs containing Stafford's functional capacity assessment), 717 (Dr. Jacobs noting that he concurred with Stafford's opinion), 724 (same). Additionally, Dr. Berezin, who evaluated Brush four times, concluded in 2011 that Brush could perform sedentary work with minimal lifting, R. 500, and in 2013 after Brush's surgery, opined that Brush could "work in modified capacity involving activities that require no repetitive bending, lifting, no repetitive turning over neck, and no lifting greater than 10 to 15 pounds," R. 835. Supporting this opinion, Dr. Weinstein concluded in late March 2015 that Brush was "capable of working at a light duty demand level with the expectation of being able to exert up to 20 pounds of force occasionally and up to 10 pounds of force frequently." R. 969. As explained in Section III.A.1 above, the ALJ properly attributed great weight to the medical opinions of Dr. Berezin and Dr. Weinstein, as they were based on a review of medical records and objective medical testing, and reflected variations in Brush's condition over time.

Brush contends that the ALJ should have found greater limitations in the use of her hands for fingering and handling. Pl. Mem. at 20. But the medical record supports the ALJ's finding that Brush could frequently use her hands for fingering and handling. Dr. Manyam in May 2012 noted that Brush's "[h]and and finger dexterity [was] intact," and that her "grip strength [was] 5/5 bilaterally." R. 607. Dr. Jacobs in March 2013 found that Brush had full five out of five strength bilaterally in her shoulders and wrists, that her reflexes were intact, and endorsed an opinion from Stafford that limited Brush to frequent manipulation of small objects with her fingers. R. 716. Dr. Weinstein similarly found Brush's reflexes intact and strength "well preserved" bilaterally in her upper and lower extremities in March 2015, R. 967-68, as did Dr. Berezin in December 2015, R. 1028. And Dr. Bachar, a treating source, opined in June 2015 that Brush could grasp, turn, and twist objects and feel objects with her hands and arms at work

on a "regular basis." R. 935. Additionally, testing in August 2015 discovered no new neurological abnormalities or significant changes in Brush's abilities to use her hands. R. 957-58.

Brush also argues that the ALJ made two findings with respect to Brush's neck flexibility that were improper, see Pl. Mem. at 20 — first, that Brush can "frequently flex, extend, and rotate the neck," and second, that she "can constantly hold the neck in one position," R. 21. We find substantial support in the record for these findings. The ALJ noted that Brush herself testified that she can drive, that she cooks and cleans, and that she uses a computer for around thirty minutes at a time, all activities that require either frequent moving the neck or constantly holding it one position, or a mixture of both. See R. 63, 65, 115. The ALJ also noted various medical opinions that found Brush had no remaining neck impairments, had undergone a successful surgery to repair a disc injury in her neck, and retained flexibility in her neck. See R. 717-728 (Dr. Jacobs reporting after surgery that Brush "is making a steady improvement" and reporting normal muscle tone bilaterally), 835 (Dr. Berezin noting that Brush's neck showed "no tenderness, no spasm, active range of motion, forward flexion 30 degrees, extension 30 degrees, rotation 60 degrees, forward rotation 45 degrees"), 886 (Dr. Weinstein noting that although Brush complained of neck discomfort, there were "no objective residual clinical findings and no postsurgical imaging findings" to corroborate her complaints), 958 (Dr. Peretz's tests in 2015 discovered no neurological abnormalities and reaffirmed that the surgery had been a success). Dr. Berezin did recommend against "repetitive" turning of the neck, R. 835, but we do not view this as inconsistent with the ALJ's RFC which limits Brush to "frequent" flexing of the neck. R. 835.

Finally, we reject Brush's argument that the ALJ erred in declining to find that Brush was likely to be absent from work at least three times a month. <u>See</u> Pl. Mem. at 20. While Dr. Newton opined that Brush would be absent from work two to four times a month because of her depression and anxiety, R. 1021, we have already explained why the ALJ could properly discount Dr. Newton's opinion. <u>See</u> Section III.A.2. Additionally, other evidence in the record contradicted that opinion. Dr. Helprin, for example, concluded that Brush could maintain attention and concentration and maintain a regular schedule. R. 613. This opinion was supported by findings that Brush was cooperative, and had intact concentration and attention. R. 612. Accordingly, we find substantial evidence support the ALJ's RFC determination.

IV. <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings (Docket # 22) is granted and Brush's motion for judgment on the pleadings (Docket # 16) is denied. The clerk is requested to enter judgment and to close the case.

SO ORDERED.

Dated: March 26, 2018
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge